Filed 10/5/23  Bocchieri v. Farmers Insurance Exchange CA2/3

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(a). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115(a).

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| BRETON BOCCHIERI, <br><br> Plaintiff and Appellant <br><br> v. <br><br> FARMERS INSURANCE EXCHANGE, <br><br> Defendant and Respondent. | B312632 <br><br> Los Angeles County <br> Super. Ct. No. <br> 19STCV37299 |

APPEAL from a judgment of the Superior Court of Los Angeles County, Barbara M. Scheper, Judge. Affirmed.

Pierce & Shearer and Andrew F. Pierce for Plaintiff and Appellant.

Tharpe & Howell and Eric B. Kunkel for Defendant and Respondent.

# INTRODUCTION

Plaintiff Breton Bocchieri appeals after summary judgment was granted in favor of Bocchieri's automobile insurance provider, defendant Farmers Insurance Exchange (Farmers), in Bocchieri's action, which alleged breach of contract and breach of the duty of good faith and fair dealing in connection with Farmers' handling of Bocchieri's underinsured motorist (UIM) claim. We affirm.

## FACTS AND PROCEDURAL BACKGROUND

### 1.  Factual Background[1]

On October 22, 2011, Bocchieri was rear-ended by a UIM. The California Highway Patrol Traffic Collision Report concerning the incident found the UIM to be at fault. In July 2013, Bocchieri settled with the UIM's insurer, Infinity Insurance (Infinity). Infinity paid Bocchieri $15,000, the policy limit.

Bocchieri was insured by Farmers and his policy (the Policy) provided Bocchieri with UIM bodily injury coverage of $250,000. The Policy also provided, in relevant part, that a person claiming any coverage under the policy must: (1) cooperate with Farmers and assist Farmers in any matter concerning a claim or suit; (2) send Farmers promptly any legal papers received relating to any claim or suit; (3) submit to physical examinations at Farmers' expense by doctors Farmers

---

[1] The court found that Bocchieri's disputes with certain facts in Farmers' separate statement were not supported by evidence to the contrary or merely constituted evidentiary objections, and therefore concluded that those facts were undisputed. We agree with the court and likewise consider those facts to be undisputed.

selects as often as Farmers may reasonably require; (4) authorize Farmers to obtain medical and other records; (5) provide any written proofs of loss Farmers requires; and (6) submit to examination under oath upon Farmers' request. The Policy further provided: "If an insured person and we do not agree (1) that the person is legally entitled to recover damages from the owner or operator of an uninsured motor vehicle, or (2) as to the amount of payment under this part, either [the] person or we may demand that the issue be determined by arbitration. . . . [¶] . . . [¶] Formal demand for arbitration shall be filed in a court of competent jurisdiction. The court shall be located in the county and state of residence of the party making the demand. Demand may also be made by sending a certified letter to the party against whom arbitration is sought, with a return receipt as evidence."

In July 2013, Bocchieri informed a Farmers claims representative that he had settled with Infinity, but his injuries exceeded the UIM's policy limit. In August 2013, Bocchieri spoke with another representative. Internal notes for the call state that the representative requested the Infinity settlement documents and Bocchieri said he would send them over. Bocchieri further stated that he had severe headaches and was willing to sign a medical authorization form. Bocchieri also stated that he had a loss of earnings claim for the second year after the accident because the injury held him back in his law practice.

On an unspecified date, Bocchieri spoke with a Farmers claims representative and offered to provide medical records "on the condition that, once received, Farmers would review the information and make an earnest reasonable evaluation and offer

under [his] policy. Farmers, through its agents, accepted this agreement."

On August 23, 2013, Farmers requested a signed medical record authorization from Bocchieri, following Bocchieri's claim that he was suffering from continued and unresolved headaches and back pain, which were causing loss of income. On September 23, 2013, Bocchieri returned the signed authorization and identified two doctors, Dr. Sheps and Dr. Aufiero.

On October 8, 2013, Bocchieri sent a formal demand for UIM arbitration to Farmers via certified mail. The demand letter stated that Bocchieri was granting Farmers an open extension as to commencing arbitration subject to termination upon 30 days' notice so that Bocchieri and Farmers could attempt to reach a settlement. The next day, Bocchieri spoke with a claims representative who informed him that Farmers needed proof of the underlying settlement with Infinity. Farmers' internal records indicate that Bocchieri was "upset and said that no one has ever explained this to him." In his declaration, Bocchieri stated that this was the first time that a Farmers representative informed him that Farmers required the Infinity settlement documents and that he informed the representative that he did not have them. The representative he spoke with agreed to follow up with Infinity concerning the settlement documents.

In January 2014, Farmers field claims representative Kenneth Spero began handling the matter. Spero noted in an internal report that he "ordered insd records via prodoc" and "tried to call [I]nfinity to get copy of underlying docs and proof of payments on meds."

In February 2014, Spero noted in internal records that Farmers had received partial medical records. These included

MRI scans of Bocchieri's spine, brain, and left shoulder taken November 2011, June 2012, and July 2012, respectively. Spero noted internally that it also "[a]ppears insd has been undergoing a series of injections of Platelet Rich Plasma into his neck to control his headache issue. Appears to be an ongoing problem." He wrote that additional medical records were pending, but Bocchieri's issues appeared to be pre-existing and that "[w]ithout additional info. [i]t does not appear likely any of this tx is accident related but otherwise due to clmt's ongoing pre-accident complaints." Spero left reserves for the claim at $5,000 at that time.

Farmers sent four letters between March 10 and June 2, 2014, stating that Farmers was still awaiting complete medical records from its copy service. Farmers also requested that Bocchieri provide the underlying settlement documents with Infinity. Farmers ultimately obtained the underlying settlement documents from Infinity, including partial medical records and reports for treatment Bocchieri received until December 31, 2013.

In an internal report dated January 7, 2015, Spero wrote that Bocchieri had informed Spero that he was still receiving treatment and intended to claim loss of earnings. Spero also wrote that Bocchieri was "going to be sending in additional meds and supporting docs." Farmers sent 10 letters between January 7 and September 3, 2015, requesting that Bocchieri provide additional medical records for treatment received after January 2, 2014, as well as documentation for any lost wages claimed. In his declaration, Bocchieri stated that he "did not have these records as they resided with my providers." There is no indication that he told Farmers this or responded to Farmers' letters until September 2015.

On September 24, 2015, Bocchieri sent a letter to Farmers demanding settlement of the claim for his policy limit of $250,000 and requesting a response by October 9, 2015. Bocchieri also stated that he was no longer making a claim for lost wages "at this time." The letter also attached approximately 70 pages of medical records. One of the reports from Dr. Aufiero noted that Bocchieri had a previous MRI scan from 2006. A report on the MRI scan performed in November 2011 also referred to a July 2006 MRI scan and stated that a central disk extrusion was "new when compared to the 2006 study." The 2006 MRI scan was not included in the records that Bocchieri provided.

In an internal report dated September 28, 2015, Spero noted that the medical records reflected 41 chiropractic visits and 64 physical therapy visits, but no bills or records for those visits were otherwise provided. Spero wrote: "As previously noted, insd appears to have a long history of neck issues and recurrent migraines. The meds and records we previously received from the clmt suggest that the clmt had been receiving these similar kinds of tx prior to the date of loss and it does not appear the accident really exacerbated the condition. None of the ortho records indicate the loss as having a factor in his condition. Ortho records in file go back to March of 2010, more than 1.5 years prior to the loss." Spero estimated that the case had a potential value in excess of $150,000 and recommended that Farmers request a "5–10 year history pre-dating the date of loss and request all those meds as well."

On October 1, 2015, Spero responded to Bocchieri's letter. He acknowledged receipt of the demand but stated that Farmers was not in a position to accept or reject the demand at that time. Spero stated that additional documents were required to

complete Farmers' investigation, including a 10-year medical history including all physicians and medical facilities Bocchieri had seen, including his primary care physician. Farmers also requested a recorded statement from Bocchieri related to his injuries and asked him to sign and return the attached medical authorization. Farmers stated that it would order "all of [Bocchieri's] records going back the last 10 years, including all X-rays and MRI films both before the loss and after for review." The attached "Authorization for Release of Health Information" asked that Bocchieri identify health care providers who were authorized "to disclose any and all of [his] Patient Information." The authorization also requested that he identify the provider's address and phone number as well as his treating physician. Bocchieri stated in his declaration that he "promptly signed and returned" the medical authorization. The authorization is not in the record and Bocchieri does not identify any portion of Farmers' internal records that reflect its receipt of this authorization or the medical providers he identified.

In internal records dated November 2, 2015, Tammie Hieb, a special general adjuster for Farmers, noted that she had reviewed the medical records and that "it is clear that the insured has had long standing chronic neck pain AND headaches" for which he had received various treatments "since 2006 wherein he was involved in a MVA and sustained a significant whiplash injury."

On November 2, 2015, Hieb emailed Bocchieri, informing him that the claim had been reassigned to her due to the significant causation and apportionment questions that existed regarding Bocchieri's "treatment, ongoing residuals and overall damages" in light of Bocchieri's "significant pre-existing

condition." Hieb's email also noted that Farmers had yet to receive a response to the October 1 letter outlining the additional information needed to evaluate Bocchieri's claim, and that the matter had been referred to arbitration counsel "to assist in the additional discovery needed in the event UIM arbitration is ultimately necessary."

On May 23, 2016, arbitration counsel for Farmers served written discovery on Bocchieri, who did not respond. Counsel for Farmers also noticed a deposition for September 20, 2016, for which Bocchieri did not appear. Bocchieri did not respond to discovery requests through September 2017.

In a November 2016 letter, Bocchieri wrote that his litigation schedule prevented his cooperation and demanded a stay of all action in the arbitration until he was available to litigate it, after August 15, 2017.

In the interim, Farmers consulted Dr. Charles D. Rosen, a board-certified orthopedic surgeon, for an expert medical opinion based on medical records it had been able to subpoena. On September 29, 2017, Dr. Rosen issued a written report. He opined that the November 2011 MRI showed evidence of an extruded disc herniation. Dr. Rosen also reviewed an MRI scan taken in 2006, after Bocchieri's first accident, which showed "no evidence of any disc herniation, subluxations or soft-tissue injuries." Dr. Rosen noted that Bocchieri developed continued headaches after the 2006 accident and that his treatment for these headaches continued into 2011. Dr. Rosen concluded: "It appears that his symptoms of neck pain that changed after the incident in question for the worse are related to the disc herniation, but his continued occipital pain as well as facet pain . . . for which he has had injections is unrelated to the incident in question." Dr. Rosen

stated that future medical care would involve an anterior cervical discectomy and fusion at the estimated cost of $50,000 to $75,000 as well as three months of rehabilitation and physical therapy. He did not anticipate further treatment beyond that with respect to the incident in question. Dr. Rosen also transcribed his review of Bocchieri's medical records, which dated from January 2006 through August 2017.

Upon review of Dr. Rosen's opinion, Farmers tendered the Policy limit to Bocchieri, less the settlement of $15,000 he received from Infinity.[2] By October 18, 2017, Bocchieri had signed a "UM/UIM TRUST AGREEMENT AND RELEASE IN FULL" acknowledging his receipt of $235,000 and executing a release applying to all claims and injuries arising out of the accident, other than bad faith claims.

Farmers' person most knowledgeable, Todd Cereghino, testified that Farmers normally obtained medical records in one of two ways: "Either the person or their representative, their attorney, will send in those to us, or they will provide a signed medical authorization, and then we will request those records that way." Cereghino testified that it was his belief that medical authorizations only last for a year. He had no knowledge of whether Bocchieri delayed in returning medical authorization forms sent to Farmers. Cereghino also did not recall whether there were any medical records Farmers had requested from Bocchieri that he had not provided as of September 2015, or whether there had been attempts to calculate the cost of future medical care prior to Dr. Rosen's report.

---

[2] Bocchieri does not argue he was entitled to more than $235,000 under the Policy.

Cereghino testified that he did not know why a medical expert was not given the records earlier. When asked whether they could have been submitted in 2013 or 2014, Cereghino replied that the question "assum[ed] that we had the information that we needed, that he ultimately based his decision on, which we did not have at the time." He agreed that Farmers did not ask any doctor to evaluate the injuries prior to litigation. When asked whether there was a policy around that, Cereghino testified: "It's just a decision made in this particular case. Each claim is different. There's no specific policy for when or when not to use an expert." Cereghino further testified that, "if a claim goes to litigation, then defense counsel will utilize a defense medical expert, like in this case with Dr. Rosen. But usually, if it's pre-litigation, we do not utilize a defense medical expert or have films reviewed."

Spero testified that, in 2013 or 2014, claims representatives typically would not refer a medical report to a doctor unless that claim had gone to litigation. However, he stated that there "may be some circumstances where we feel that maybe what's going on with the MRIs don't necessarily make sense with what happened in the accident, so we might request that they — we might order those and request that they be read by a doctor and see if they concur with what the report says." Spero did not recall asking Bocchieri for medical authorizations that he did not provide but stated that he "suspect[ed] the reason we asked him for another one is it had expired or did not include the new providers."

## 2. Procedural Background

Approximately two years after Bocchieri settled his UIM claim, he filed a complaint against Farmers, alleging causes of action for breach of contract and tortious breach of the implied

10

covenant of good faith and fair dealing. Bocchieri alleged that Farmers breached the contract "by failing to timely pay [his] claim or process in a timely or reasonable manner." He alleged that Farmers tortiously breached the implied covenant of good faith and fair dealing by "[f]ailing to timely investigat[e] and respond promptly to the insured's claim," "[p]lacing their interests in ahead of the insured," "[f]ailing to respond to inquiries from the insured," "[r]epeatedly asking for the same documents," and "[s]cheduling arbitration so as to disadvantage [Bocchieri]." Bocchieri also alleged that Farmers acted in a manner knowingly harmful to his rights, in violation of Civil Code section 3294, and therefore sought punitive and exemplary damages.

Farmers subsequently moved for summary judgment, or in the alternative, summary adjudication of the issues. The trial court granted Farmers' motion. With respect to the breach of contract claim, the court stated that, in order to establish a breach of contract claim, the policyholder must establish that they were entitled to benefits under the relevant policy and those benefits were not paid. Because the undisputed evidence showed that Farmers paid all the insurance policy benefits to which Bocchieri was entitled, the court concluded that the breach of contract claim failed.

With respect to the tortious breach of the implied covenant of good faith and fair dealing claim, the court concluded that the undisputed facts show that there was a genuine dispute as to the cause and severity of Bocchieri's injuries in light of his previous automobile accident in 2006. The court noted that Bocchieri presented no evidence that Farmers had the 2006 MRI scan in its possession since 2014. The first medical records received

11

indicated treatments predating the 2011 accident and "created a question as to whether [Bocchieri] had pre-existing conditions that were not caused or exacerbated by the 2011 accident." At this point, Spero left the reserves for the claim at $5,000. The further medical records Farmers received in 2015 "changed the entire complexion of the case." Farmers assessed the value of the case at $150,000.

The court concluded that, based on the undisputed facts, Farmers' delay in paying Bocchieri was not unreasonable. When Farmers attempted to complete its investigation into Bocchieri's medical history and obtain a sworn statement, Bocchieri failed to respond. When Farmers resorted to arbitration to try and get the necessary information, Bocchieri demanded that the action be stayed. While the matter was stayed pursuant to Bocchieri's request, Farmers submitted the medical records to its expert, Dr. Rosen, who confirmed that Bocchieri's injuries were caused by the 2011 accident and opined as to the cost associated with continuing medical treatment. Farmers thereafter promptly paid Bocchieri the policy limit.

The court also sustained certain of Farmers' objections to the declaration submitted by Bocchieri. Specifically, the court sustained objections to Bocchieri's statements that: (1) Farmers refused to settle his claim, "notwithstanding that liability on the part of the underinsured motorist was open and shut" and "began a pattern of bad faith delay and dilatory tactics which lasted more than four years"; (2) Bocchieri repeatedly contacted Farmers asking whether it would pay his claim and "Farmers' claim adjusters repeatedly and over the course of the next several years, repeatedly stated that they could not make a decision"; (3) over the next four years, "Farmers repeatedly refused to even

12

process [his] claim on the merits claiming that it would take more time without specific justification for the interminable and ongoing delay," its representatives failed to provide any substantive reason for the delay, it sent repeated waivers even though it had already received Bocchieri's medical records, and it refused to provide any evaluation and made no offer of compromise, even though Bocchieri promptly signed every waiver; (4) Bocchieri received a request for production of documents and notice that arbitration had been initiated by Farmers "notwithstanding its prior promise to evaluate the claim, based on the medical records"; (5) Farmers sent numerous requests for production "despite the fact that it already had in its possession all of the documents sought in the requests and all waivers requested regarding [Bocchieri's] medical records"; and (6) when Farmers decided to settle based on Dr. Rosen's report, "[n]o explanation for the delay was presented nor could there be any explanation given that Farmers elected to settle the case based on the information they had already had for years and without the necessity to engage in baseless litigation."

The court overruled Bocchieri's objections to Farmers' evidence.

Bocchieri moved for reconsideration, which the court denied.[3] The court entered judgment in March 2021. Bocchieri timely appealed.

---

[3] Bocchieri does not challenge the court's ruling on the motion for reconsideration on appeal.

13

## DISCUSSION

Bocchieri contends that the court erred in granting summary adjudication of his breach of contract cause of action because he was "entitled to a timely investigation and payment and . . . this did not occur," in violation of Insurance Code section 790.03, and a violation of the Insurance Code is prima facie evidence of a breach of contract. He further argues that he was damaged by the breach of contract, notwithstanding that Farmers paid the policy limit, because he was entitled to interest on that amount. Bocchieri contends that the court erred in granting summary adjudication of his bad faith claim because there "were and are triable issues of fact that 1) Farmers was unreasonable in adopting a policy that medical records would not be reviewed by qualified individuals until litigation commenced; and 2) that Farmers' decision that Plaintiff's claim was sufficient for a six figure offer, and ultimately a policy limit offer, was based entirely on medical information available to Farmers, and in their files, many years before the offer was made."

Farmers contends that Bocchieri impermissibly relies on evidence that was excluded by the court and that his arguments with respect to both causes of action fail in the absence of this evidence. Farmers also argues that Bocchieri fails to support his contention that a violation of the Insurance Code constitutes a breach of contract with law, that there is no private right of action under Insurance Code section 790.03, and that Bocchieri's claim has no basis in the Policy. It also argues that Bocchieri is not entitled to interest on his policy benefits under the law. Finally, with respect to the bad faith claim, Farmers contends that Bocchieri fails to establish that Farmers unreasonably delayed when he identifies no evidence indicating when Farmers

received the medical records that permitted Dr. Rosen's analysis, specifically the 2006 MRI scans. Farmers also disputes that any alleged policy regarding referring medical records for doctor review impacted the handling of Bocchieri's claims under the undisputed facts.

## 1.    Standard of Review

The standard of review for summary judgment is well established. The motion "shall be granted if all the papers submitted show that there is no triable issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." (Code Civ. Proc.[4], § 437c, subd. (c).) A moving defendant has met his burden of showing that a cause of action has no merit by establishing that one or more elements of a cause of action cannot be established or that there is a complete defense. (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 849–850; *Lackner v. North* (2006) 135 Cal.App.4th 1188, 1196.)

We independently review an order granting summary judgment, viewing the evidence in the light most favorable to the nonmoving party. (*Saelzler v. Advanced Group 400* (2001) 25 Cal.4th 763, 768.) In performing our independent review of the evidence, "we apply the same three-step analysis as the trial court. First, we identify the issues framed by the pleadings. Next, we determine whether the moving party has established facts justifying judgment in its favor. Finally, if the moving party has carried its initial burden, we decide whether the opposing party

---

[4] All undesignated statutory references are to the Code of Civil Procedure.

has demonstrated the existence of a triable, material fact issue." (*Chavez v. Carpenter* (2001) 91 Cal.App.4th 1433, 1438.)

In determining whether there are triable issues of material fact, we consider all the evidence set forth by the parties, except that to which objections have been made and properly sustained. (§ 437c, subd. (c); *Guz v. Bechtel National, Inc.* (2000) 24 Cal.4th 317, 334.) We accept as true the facts supported by plaintiff's evidence and the reasonable inferences therefrom (*Sada v. Robert F. Kennedy Medical Center* (1997) 56 Cal.App.4th 138, 148), resolving evidentiary doubts or ambiguities in plaintiff's favor (*Saelzler v. Advanced Group 400*, *supra*, 25 Cal.4th at p. 768).

"Furthermore, our review is governed by a fundamental principle of appellate procedure, namely, that ' "[a] judgment or order of the lower court is *presumed correct*," ' and thus, ' "error must be affirmatively shown." ' [Citation.] Under this principle, plaintiff bears the burden of establishing error on appeal, even though defendants had the burden of proving their right to summary judgment before the trial court. [Citation.] For this reason, our review is limited to contentions adequately raised and supported in plaintiff's brief." (*Arnold v. Dignity Health* (2020) 53 Cal.App.5th 412, 423.)

2. **Bocchieri has forfeited his challenge to the trial court's evidentiary rulings.**

Bocchieri relies on portions of his declaration as to which objections were sustained but does not challenge the trial court's evidentiary rulings. Before addressing whether the court properly granted summary judgment in favor of Farmers, we must determine what portion of Bocchieri's proffered evidence we may consider on appeal.

16

In reviewing the court's summary judgment ruling, we generally consider all evidence set forth in the moving and opposing papers except those matters as to which objections were made and sustained. (§ 437c, subd. (c).) It is well established that a party who fails to "attack the [trial court's evidentiary] rulings on appeal . . . forfeit[s] any contentions of error regarding them. [Citation.]" (*Frittelli, Inc. v. 350 North Canon Drive* (2011) 202 Cal.App.4th 35, 41; accord, *Lopez v. Baca* (2002) 98 Cal.App.4th 1008, 1014–1015 [party waived "any issues concerning the correctness of the trial court's evidentiary rulings" by failing to "challenge the trial court's ruling sustaining . . . objections to certain evidence offered in opposition to the summary judgment motion"].) Thus, when an appellant fails to challenge evidentiary rulings barring evidence submitted in support or opposition of summary judgment, "we exclude this evidence from our review of the summary judgment motion." (*Wall Street Network, Ltd. v. New York Times Co.* (2008) 164 Cal.App.4th 1171, 1181.)

A party cannot preserve its challenge to the court's evidentiary rulings simply by relying on the excluded evidence on appeal. Bocchieri does not address any specific objections, nor does he explain why the court abused its discretion in sustaining them. " 'Appellate briefs must provide argument and legal authority for the positions taken. "When an appellant fails to raise a point, or asserts it but fails to support it with reasoned argument and citations to authority, we treat the point as waived." ' [Citation.] 'We are not bound to develop appellants' argument for them. [Citation.] The absence of cogent legal argument or citation to authority allows this court to treat the contention as waived.' [Citations.]" (*Cahill v. San Diego Gas & Electric Co.* (2011) 194 Cal.App.4th 939, 956.)

Accordingly, we predicate our analysis of the summary judgment ruling on the evidence admitted in the trial court and disregard Bocchieri's references to statements in his declaration that the court excluded.

**3.    The trial court did not err in granting summary adjudication of the breach of contract cause of action.**

"Unreasonable delay in paying policy benefits or paying less than the amount due is actionable withholding of benefits which may constitute a breach of contract as well as bad faith giving rise to damages in tort. [Citations.]" (*Intergulf Development LLC v. Superior Court* (2010) 183 Cal.App.4th 16, 20.)

Bocchieri argues that Farmers breached the contract by "failing to timely pay Plaintiff's claim or process it in a timely manner or reasonable manner." The quoted language is from his complaint, not the Policy. Bocchieri does not identify any obligations in the Policy that Farmers breached. Rather, Bocchieri asserts that the Insurance Code requires prompt investigation into claims and payment of policy benefits (Ins. Code, § 790.03, subd. (h)(3) & (5)) and that "[v]iolation of a statute is prima facie evidence of a breach of contract." Bocchieri cites no authority in support of this contention in his opening brief.

In *Moradi-Shalal v. Fireman's Fund Ins. Companies* (1988) 46 Cal.3d 287, 304–305, the Supreme Court concluded that there was no private right of action under Insurance Code section 790.03, subdivision (h). However, it "expressly held that ' . . . the courts retain jurisdiction to impose civil damages or other remedies against insurers in appropriate common law actions, based on such traditional theories as fraud, infliction of emotional

18

distress, and (as to the insured) either breach of contract or *breach of the implied covenant of good faith and fair dealing*.' [Citation.] Thus, these common law claims remain as a firm legal basis on which an insured may rely to seek redress against an insurer." (*State Farm Fire & Casualty Co. v. Superior Court* (1996) 45 Cal.App.4th 1093, 1108, abrogated on another ground by *Cel-Tech Communications, Inc. v. Los Angeles Cellular Telephone Co.* (1999) 20 Cal.4th 163.)

The parties both argue that *Moradi-Shalal* supports their positions. Farmers contends that, because there is no private right of action under Insurance Code section 790.03, Bocchieri cannot recover damages for a breach of this statute alone. Bocchieri argues that federal cases have interpreted *Moradi-Shalal* as stating that the violation of section 790.03 establishes a breach of an insurance contract.

In *Lincoln General Ins. Co. v. Access Claims Administrators, Inc.* (E.D. Cal. 2009) 596 F.Supp.2d 1351, 1366, on which Bocchieri relies, the relevant contract "required [the insurer] to '[p]repare and file all reports and handle all claims in accordance with established claims procedures and state guidelines, assuring compliance with the Fair Claims Practice Act, California Insurance Frauds Prevention Act and all other applicable statutes and regulations.' " The court concluded that the plaintiffs were not attempting to assert a cause of action under the Insurance Code but were instead arguing that the requirements of the Insurance Code were expressly integrated into the contract and that the violation of the Insurance Code therefore constituted a breach of contract. (*Id.* at p. 1367; see also *Berger v. Home Depot U.S.A., Inc.* (C.D. Cal. 2007) 476 F.Supp.2d 1174, 1177 ["plaintiffs must be required to do something more to

19

allege a breach of contract claim than merely point to allegations of a statutory violation"].) Thus, contrary to Bocchieri's contention, *Lincoln* does not stand for the proposition that the provisions of the Insurance Code are integrated into all insurance contracts or that a plaintiff need only claim a violation of the Insurance Code to establish breach of contract.[5]

Bocchieri fails to direct us to any California law supporting that conduct that violates the Insurance Code is prima facie evidence of a violation of an insurance contract, nor does he identify any provision of the Policy that expressly integrates the requirements of the Insurance Code, as in *Lincoln*. Absent an affirmative showing that the facts and law support that a failure to comply with Insurance Code section 790.03, subdivision (h)(3) and (5), constitutes a breach of the Policy, we cannot conclude that the court erred in granting summary adjudication of the breach of contract cause of action. (*Arnold v. Dignity Health*, *supra*, 53 Cal.App.5th at p. 423.)

Accordingly, we need not determine whether there is a dispute of material fact as to whether Farmers complied with Insurance Code section 790.03. We also need not reach the question of whether the absence of contract-related damages, on which the court relied, provides another ground to affirm,[6] or

[5] *In re National Western Life Ins. Deferred Annuities Litigation* (S.D. Cal. 2006) 467 F.Supp.2d 1071, 1078–1079, which Bocchieri cites, also does not stand for this proposition.

[6] See *Case v. State Farm Mutual Automobile Ins. Co., Inc.* (2018) 30 Cal.App.5th 397, 402 ["In view of the requirement for contract-related damages, an insurer may secure summary adjudication on the claim when there are no unpaid policy benefits."], citing *Behnke v. State Farm General Ins. Co.* (2011) 196 Cal.App.4th 1443, 1468.

Bocchieri's contention that he was damaged, notwithstanding Farmers' payment of the UIM limit under the Policy, because Farmers is liable for interest on the benefits paid under Civil Code section 3302.

4. **The trial court did not err in granting summary adjudication of the breach of implied covenant of good faith and fair dealing cause of action.**

"[T]o succeed on a claim for breach of the implied covenant, the insured must show that 'the insurer acted *unreasonably or without proper cause*.' [Citation.] The insured must show the insurer's conduct 'demonstrates a failure or refusal to discharge contractual responsibilities, prompted not by an honest mistake, bad judgment or negligence but rather by a conscious and deliberate act, which unfairly frustrates the agreed common purposes and disappoints the reasonable expectations of the other party thereby depriving that party of the benefits of the agreement.' [Citation.]" (*Mosley v. Pacific Specialty Ins. Co.* (2020) 49 Cal.App.5th 417, 436.)

"Before an insurer can be found to have acted in bad faith for its delay or denial in the payment of policy benefits, it must be shown that the insurer acted *unreasonably* or *without proper cause*. Where there is a *genuine issue* as to the insurer's liability under the policy for the claim asserted by the insured, there can be no bad faith liability imposed on the insurer for advancing its side of that dispute. [Citation.] Moreover, it must be remembered that 'an insurer is not required to pay every claim presented to it. Besides the duty to deal fairly with the insured, the insurer also has a duty to its other policyholders and to the stockholders (if it is such a company) not to dissipate its reserves through the payment of meritless claims. Such a practice inevitably would

21

prejudice the insurance seeking public because of the necessity to increase rates, and would finally drive the insurer out of business. . . .' [Citations.]" (*Jordan v. Allstate Ins. Co.* (2007) 148 Cal.App.4th 1062, 1072.)

In other words, " '[t]he mistaken [or erroneous] withholding of policy benefits, if reasonable or if based on a legitimate dispute as to the insurer's liability under California law, does not expose the insurer to bad faith liability.' [Citations.] . . . [T]he reasonableness of the insurer's decisions and actions must be evaluated as of the time that they were made; the evaluation cannot fairly be made in the light of subsequent events that may provide evidence of the insurer's errors." (*Chateau Chamberay Homeowners Assn. v. Associated Internat. Ins. Co.* (2001) 90 Cal.App.4th 335, 346–347.) Although an insurer's bad faith is ordinarily a question of fact to be determined by a jury by considering the evidence of motive, intent and state of mind, " 'the question becomes one of law . . . when, because there are no conflicting inferences, reasonable minds could not differ. [Citation.]' " (*Id.* at p. 350.)

We agree with the court that, based on the undisputed evidence, a reasonable jury could not conclude that Farmers did not have a genuine dispute as to the cause of Bocchieri's injuries. Farmers' review of Bocchieri's medical records revealed that Bocchieri had received treatment for headaches since before the 2011 accident and was involved in a prior automobile accident in 2006. Farmers was entitled to thoroughly investigate the claim before resolving the claim. Dr. Rosen's uncontested conclusion that Bocchieri's headaches were not attributable to the 2011 accident, whereas his neck pain was, demonstrate that the

injuries for which Bocchieri was receiving ongoing treatment were, in part, preexisting.

Of course, "[t]he genuine dispute rule does not relieve an insurer from its obligation to thoroughly and fairly investigate, process and evaluate the insured's claim." (*Wilson v. 21st Century Ins. Co.* (2007) 42 Cal.4th 713, 723 (*Wilson*).) A fair investigation means one without unreasonable delay.

"There can be no 'unreasonable delay' until the insurer receives adequate information to process the claim and reach an agreement with the insureds." (*Globe Indemnity Co. v. Superior Court* (1992) 6 Cal.App.4th 725, 731 (*Globe Indemnity Co.*).) In *Globe Indemnity Co.*, the insureds sued their insurer for bad faith in connection with a claim made pursuant to their uninsured motorist coverage after their daughter was injured while riding as a passenger on a stolen motorcycle involved in a high-speed police chase. (*Id.* at p. 727.) The policy excluded coverage for use of a vehicle without a reasonable belief that the person was entitled to do so. (*Ibid.*) The insureds and their attorney did not cooperate with the insurer's attempts to question the daughter, and the daughter only appeared for a deposition months after the insureds' suit was filed. (*Id.* at p. 728.) When the daughter testified during the deposition that she did not know the motorcycle was stolen, the insurer, through its representative present at the deposition, immediately acknowledged coverage. (*Ibid.*)

The trial court in *Globe Indemnity Co.* denied the insurer's motion for summary judgment and the insurer successfully petitioned for a writ of mandate directing the trial court to vacate its order denying summary judgment or summary adjudication of issues. (*Globe Indemnity Co.*, *supra*, 6 Cal.App.4th at pp. 728,

731–732.) The Court of Appeal concluded that "[t]he contractual duty to pay policy proceeds did not arise until plaintiffs provided the information necessary to allow [the insurer] to determine whether the accident on the stolen motorcycle was covered under the terms of the policy." (*Id.* at p. 731.) The insurer "did not receive adequate information to process the claim until after [the plaintiffs' daughter] submitted to examination under oath pursuant to the terms of the insurance policy," and thus the insurer's "delay in processing the claim was caused solely by plaintiffs' failure to provide information about [the plaintiffs' daughter's] knowledge or lack of knowledge that the motorcycle was stolen." (*Ibid.*)

Bocchieri argues that Farmers had everything it needed to evaluate his claim in 2014. In contrast, Farmers argues that it was only by comparing the MRI scans from 2006 and 2011 that Dr. Rosen was able to draw conclusions as to the cause of Bocchieri's symptoms and there is no evidence that Farmers had the 2006 MRI scan as of 2014.

The original medical authorization form signed by Bocchieri in 2013 is not in the record. However, according to Farmers' internal records and Bocchieri's declaration, Bocchieri identified two doctors: Dr. Sheps and Dr. Aufiero. The medical record summarized by Dr. Rosen in his report indicates that Bocchieri began seeing Dr. Aufiero in June 2010 and Dr. Sheps in November 2011. Thus, there is no evidence in the record from which a jury could infer that Farmers' initial order of medical documents from Dr. Sheps and Dr. Aufiero included records from other doctors for the years preceding the 2011 accident, including the 2006 MRI scan. Rather, Farmers' internal reports indicate that, as of September 2015, it had obtained records going back to

24

only 2010 that suggested that Bocchieri had been involved in a prior accident.

The record indicates that Spero and Bocchieri spoke sometime in January 2015 and that, pursuant to their discussion, Bocchieri was "going to be sending in additional meds and supporting docs."[7] It is also undisputed that Farmers sent 10 letters between January 7 and September 3, 2015, requesting that Bocchieri provide additional medical records for treatment received after January 2, 2014, as well as documentation for any lost wages claimed. After telling Spero that he would provide further relevant documentation, there is no evidence that Bocchieri acknowledged Spero's monthly requests at any point before September 2015.

In September 2015, Bocchieri provided further medical records for treatments he had received between 2011 and 2015. Based on its review of these records and previously received records, Farmers concluded that it was likely that Bocchieri's

---

[7] At oral argument, counsel for Bocchieri emphasized a January 5, 2015 note in Farmers' internal records stating that Cereghino had told Bocchieri that Farmers "dropped the ball" in response to Bocchieri's complaints that he had not heard from Farmers since the prior summer and that the claim was not resolved. Bocchieri did not, however, rely on this evidence in the argument portion of his opening brief or anywhere in his reply. In any event, Bocchieri does not identify evidence supporting that Farmers had the information it needed to evaluate the claim and delayed in acting on it by January 5, 2015, as is necessary to create an inference of bad faith. (See *Globe Indemnity Co.*, *supra*, 6 Cal.App.4th at p. 731.) During his discussion with Cereghino and a discussion with Spero two days later, Bocchieri also stated that he intended to pursue a loss of earnings claim and that he would send additional records and supporting documents, which further undermines the assertion that Farmers had adequate information to resolve the claim prior to that time but failed to do so.

injuries were due to a preexisting condition and that it needed further information to determine whether that was the case. Farmers requested a recorded statement from Bocchieri related to his injuries and asked him to sign and return the attached medical authorization so that it could order "all of [Bocchieri's] records going back the last 10 years, including all X-rays and MRI films both before the loss and after for review." Although Bocchieri stated in his declaration that he "promptly signed and returned" the authorization, the authorization is not part of the record and his declaration fails to identify the date on which he returned the document to Farmers. Bocchieri's vague statement that he acted promptly does not create a material dispute as to whether he failed to respond to Spero's letter by November 2, 2015, as Hieb stated in her email. (See *Sinai Memorial Chapel v. Dudler* (1991) 231 Cal.App.3d 190, 196–197 ["[A]n issue of fact is not raised by 'cryptic, broadly phrased, and conclusory assertions' [citation]. . . . '[W]hile the court in determining a motion for summary judgment does not "try" the case, the court is bound to consider the competency of the evidence presented.' [Citation.]".)

However, we accept that Bocchieri signed and returned the document. Nevertheless, there is no evidence supporting that he identified all relevant health care providers for the 10 years preceding the 2011 accident, including the doctors who referred him for the 2006 MRI scans or the radiologists. Bocchieri did not dispute that Dr. Rosen's report was "based only on the medical records that [Farmers] was able to subpoena," as opposed to records it was able to obtain pursuant to a medical authorization.

There is also no evidence in the record indicating at what point between November 2015 and September 2017 Farmers obtained records for the 10-year period predating 2011, which its

26

representatives believed were necessary to investigate the claim and on which Dr. Rosen ultimately relied. However, it is undisputed that Bocchieri did not submit to the requested examination under oath as required by the Policy; that Farmers' arbitration counsel issued discovery requests to which Bocchieri did not respond between June 2016 and September 2017; that, in November 2016, Bocchieri demanded a nine-month stay of proceedings in the arbitration until August 2017; that, in the interim, Farmers referred the medical records it was able to subpoena to Dr. Rosen; that Dr. Rosen issued his medical opinion in September 2017, in which he opined that Bocchieri's injuries were due in part to the 2011 accident; and that, by October 2017, Farmers settled for Bocchieri's UIM policy limit.

We conclude that Farmers met its initial burden of showing that the undisputed evidence does not permit the conclusion that it consciously and deliberately failed to discharge its contractual responsibilities. (*Mosley v. Pacific Specialty Ins. Co.*, *supra*, 49 Cal.App.5th at p. 436.). The burden therefore shifted to Bocchieri to identify evidence establishing a dispute of material fact as to when Farmers "receive[d] adequate information to process the claim and reach an agreement with the insureds" and whether its payment of the Policy limit in 2017 was unreasonable. (*Globe Indemnity Co.*, *supra*, 6 Cal.App.4th at p. 731.)

Bocchieri contends that Farmers fails to present evidence that the 2006 MRI scan was necessary to Dr. Rosen's conclusion or that a doctor could not have concluded that he was entitled to his Policy limit without the 2006 MRI scan. However, Farmers had the right and obligation to thoroughly investigate its genuine dispute as to the cause of Bocchieri's injuries. (*Wilson*, *supra*, 42 Cal.4th at p. 723.) He cites no authority for the proposition that

27

the investigation of a genuine dispute is only reasonable if it results in an outcome that would not have otherwise been reached. Moreover, Bocchieri conceded in his opening brief that Dr. Rosen reached his conclusions "based on reviewing Bocchieri's 2006 and 2011 MRIs."

Bocchieri also argues that the 2011 MRI scan report refers to the 2006 MRI scan and the 2011 MRI scan was in Farmers' possession since early 2014. He therefore argues that, if the 2006 MRI scan was necessary to Dr. Rosen's opinion, Farmers acted in an unreasonable and dilatory manner in not requesting it at that time. However, as noted above, "the reasonableness of the insurer's decisions and actions must be evaluated as of the time that they were made; the evaluation cannot fairly be made in the light of subsequent events that may provide evidence of the insurer's errors." (*Chateau Chamberay Homeowners Assn. v. Associated Internat. Ins. Co.*, *supra*, 90 Cal.App.4th at pp. 346–347.) Bocchieri's evidence demonstrates that Farmers decided to seek records for the 10 years preceding the accident because its review of Bocchieri's medical records, including those received in September 2015, indicated that Bocchieri received treatments for headaches prior to the 2011 accident and had been involved in an automobile accident in 2006, not because it belatedly noticed the reference to the 2006 MRI scan in the 2011 MRI scan report. The fact that the 2006 MRI scan ultimately proved to be among the most relevant evidence for Dr. Rosen's review does not permit the inference that Farmers was unreasonable for seeking other medical records for the period preceding the 2011 accident.

Bocchieri contends that we must construe the absence of evidence as to when Farmers obtained the 2006 MRI scan in his favor. Although we draw all inferences in favor of the non-moving

28

party, " '[a]n issue of fact can only be created by a conflict of evidence. It is not created by "speculation, conjecture, imagination or guess work." [Citation.]' " (*Brown v. Ransweiler* (2009) 171 Cal.App.4th 516, 525.) In other words, " '[w]hen opposition to a motion for summary judgment is based on inferences, those inferences must be reasonably deducible from the evidence . . . .' [Citation.]" (*Advent, Inc. v. National Union Fire Ins. Co. of Pittsburgh, PA* (2016) 6 Cal.App.5th 443, 459.) The only inference permitted by Bocchieri's evidence is that Farmers did not have medical records predating 2010 as of September 28, 2015. In the absence of any evidence that Bocchieri identified the relevant doctors for the 2006 MRI scans in his 2015 authorization, we cannot speculate that Farmers could have or did obtain the 2006 MRI scan before Bocchieri stopped cooperating with Farmers.

Bocchieri acknowledges that the undisputed facts indicate that he did not comply with his obligations under the Policy,[8] but

_____

[8] Bocchieri characterizes his noncompliance as not "immediately respond[ing] to every single, redundant inquiry letter he received from the insurer's letter-generating computers." However, Bocchieri fails to cite evidence supporting that Farmers' requests were redundant. His statements to this effect in his declaration were excluded and thus cannot be relied upon on appeal. In any event, that conclusory claim is insufficient to create a dispute of material fact. (*See Sinai Memorial Chapel v. Dudler*, *supra*, 231 Cal.App.3d at pp. 196–197.) The undisputed evidence establishes that Farmers received records reflecting medical treatment received through December 2013 and subsequently made requests for records reflecting medical treatment received after January 2, 2014, as well as documentation supporting any lost wages claimed. There is no indication in the record that Farmers already had those materials, or that Farmers' subsequent

contends that any non-compliance with the Policy does not excuse bad faith conduct by the insurer. We agree. Our Supreme Court has stated that "the duty of good faith and fair dealing on the part of defendant insurance companies is an absolute one. At the same time, we do not say that the parties cannot define, by the terms of the contract, their respective obligations and duties. We say merely that no matter how those duties are stated, the nonperformance by one party of its contractual duties cannot excuse a breach of the duty of good faith and fair dealing by the other party while the contract between them is in effect and not rescinded." (*Gruenberg v. Aetna Ins. Co.* (1973) 9 Cal.3d 566, 578.)

However, on this record, a trier of fact could not reasonably infer that Farmers had all the medical records it needed to evaluate the claim as of 2014, delayed its investigation and payment of the claim, and then sought to justify its dilatory conduct based on Bocchieri's noncompliance with the Policy. Farmers has put forward undisputed evidence that its delay in paying out the Policy resulted from Bocchieri's failure or delay to provide it with information it needed to investigate his claim. By failing to identify evidence showing when Farmers obtained medical records for the years preceding the 2011 accident, or reasonably could have done so, Bocchieri has failed to demonstrate the existence of a triable, material fact as to whether Farmers deliberately refused to discharge its contractual responsibilities.

---

request for a ten-year medical history was redundant of information it already had in its possession.

Bocchieri also argues that there is a dispute of material fact as to whether Farmers unreasonably delayed in paying out his policy because Cereghino, Farmers' person most knowledgeable, testified that he had no knowledge of whether Bocchieri failed to timely return authorizations or provide records that Farmers requested as of September 2015. We are not persuaded that Cereghino's lack of knowledge constitutes a concession of the truth of these facts or creates a dispute of material fact when there is no dispute that Dr. Rosen's report was based on medical records that Farmers subpoenaed, rather than records that it obtained pursuant to a medical authorization.

Bocchieri also argues there was a breach of the implied covenant of good faith and fair dealing because "it is Farmers['] policy not to have anybody with medical knowledge evaluate a serious injury of this nature unless Farmers is sued." *Brehm v. 21st Century Ins. Co.* (2008) 166 Cal.App.4th 1225, 1242, establishes that, although an insurer has an absolute right to demand arbitration when it fails to reach an agreement with the insured, "[a]n insurer's duty to thoroughly investigate and fairly evaluate its insured's UIM claim, so forcefully recognized in *Wilson*, *supra*, 42 Cal.4th at pages 720 to 723, has no meaning" unless there is also "an implied obligation to honestly assess [the insured's] claim and to make a reasonable effort to resolve any dispute with him as to the amount of his damages before invoking that right."

We are not persuaded that the evidence, even when viewed in Bocchieri's favor, establishes an "absolute policy that there would be no physician review prior to arbitration." Although Cereghino and Spero testified that medical records "usually" or "typically" are not sent for a doctor's review until a case has gone

31

to litigation, Cereghino further testified that "[t]here's no specific policy for when or when not to use an expert" and "[e]ach claim is different." He also stated that the decision not to refer the medical records to a doctor prior to litigation was "just a decision made in this particular case." Bocchieri does not present any evidence supporting the inference that Farmers' usual practice was a de facto policy—that is, that Farmers never referred medical records for doctor review prior to arbitration.

In any event, the undisputed evidence establishes that it was Bocchieri who demanded arbitration, not Farmers. In October 2013, Bocchieri made a formal demand for uninsured motorist arbitration by certified mail, as the Policy required. Over two years later, Hieb stated in an email that Farmers was referring the matter to arbitration counsel to assist with discovery "in the event UIM Arbitration is ultimately necessary." This was not a demand for arbitration in the manner required by the Policy. That is, Farmers neither filed a formal demand in a court of competent jurisdiction nor sent a certified letter demanding arbitration. While it is possible that arbitration counsel subsequently made a demand in the manner set forth in the Policy, Bocchieri does not identify any such demand in the record. At most, Bocchieri's evidence suggests that Farmers' arbitration counsel initiated proceedings sometime around November 2016, when Bocchieri wrote in a letter: "After sitting on its laurels for almost five years, it is inconceivable that Farmers would rush to arbitration at the worst possible time without calling its insured and working out an amenable mutually agreeable schedule."

The test of whether an insurer acts reasonably is judged by an objective standard and an insurer's subjective state of mind is

immaterial. (*FEI Enterprises, Inc. v. Yoon* (2011) 194 Cal.App.4th 790, 803; accord, *Bosetti v. United States Life Ins. Co. in City of New York* (2009) 175 Cal.App.4th 1208, 1238–1239 ["bad faith is to be determined solely by objective unreasonability"].) Assuming Farmers had the asserted policy of never sending records to doctors for review prior to litigation, its subjective bad faith is irrelevant when, objectively, it did not demand arbitration pursuant to that policy. Even if we were to consider the initiation of an arbitration proceeding sometime around November 2016 as the relevant demand for arbitration, Farmers submitted undisputed evidence that Bocchieri ceased to cooperate with its requests prior to this time. As discussed, Bocchieri has not identified evidence creating a material dispute of fact as to whether Farmers had the records it needed to fairly evaluate the claim at that time.

In sum, "even though the court [in summary judgment proceedings] may not weigh the plaintiff's evidence or inferences against the defendants' as though it were sitting as the trier of fact, it must nevertheless determine what any evidence or inference *could show or imply to a reasonable trier of fact*." (*Aguilar v. Atlantic Richfield Co.*, *supra*, 25 Cal.4th at p. 856.) Bocchieri has not demonstrated through facts or inferences that the alleged wrongful conduct by Farmers was more likely to have occurred than was any permissible conduct. (*Id.* at p. 857.)

Since we have determined the court did not err as a matter of law in finding a lack of unreasonable delay and granting summary adjudication of Bocchieri's claim for the tortious breach of the implied covenant of good faith and fair dealing, we are not required to discuss Bocchieri's further contention that he is entitled to punitive damages. (See *Behnke v. State Farm General*

33

*Ins. Co., supra,* 196 Cal.App.4th at p. 1470 ["Without tort liability, there can be no liability for punitive damages."].)

## DISPOSITION

The judgment is affirmed. Farmers shall recover its costs on appeal.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

LAVIN, J.

WE CONCUR:

EDMON, P. J.

ADAMS, J.